EUGENE HANSEN (Trial Counsel) (DC Bar No. 483638)
  hansene@sec.gov

Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington, D.C. 20549
Tel: (202) 551-6091

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 26-cv-6291 |
| Plaintiff, | |
| v. | COMPLAINT AND DEMAND FOR JURY TRIAL |
| MINGRAN WANG, | |
| Defendant. | |

Plaintiff Securities and Exchange Commission ("SEC" or "Commission"), for its Complaint against Defendant Mingran Wang ("Wang"), alleges as follows:

## JURISIDICTION AND VENUE

1.    The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)], and Sections 21(d), 21(e), and 27 of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

2.    Wang, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged in this

Complaint. Among other things, Wang placed thousands of buy and sell orders through at least two broker-dealers, through the means of the Internet.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the transactions, acts, practices, and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because Wang resides in this district.

**DIVISIONAL ASSIGNMENT**

4. Pursuant to Civil Local Rule 3-2(d), the case properly is assigned to the San Francisco or the Oakland Division because Wang resides in Alameda County and a substantial part of the events giving rise to the violations occurred in Alameda County.

**SUMMARY**

5. This case concerns a market manipulation scheme in which the Defendant, Mingran Wang, manipulated the price of more than 150 thinly traded American Depositary Receipts ("ADRs") through "spoofing."

6. "Spoofing" refers to the practice of placing non-bona fide buy or sell orders for securities, which are then canceled, to artificially increase or decrease the market price of a security. Spoofing has long been recognized as an illegal, fraudulent scheme and a form of market manipulation. Here, Wang placed buy and sell orders for ADRs that he never intended to execute. Those fake orders moved the market price of the targeted ADR securities, allowing Wang to purchase and sell ADRs at the manipulated prices. Wang placed his non-bona fide orders through accounts he controlled at one brokerage firm and executed his actual buy and sell trades through accounts he controlled at a different brokerage firm.

7. The multi-year scheme lasted from October 2021 to at least November 2024 and involved thousands of spoof orders. The scheme netted Wang more than $1.3 million in ill-gotten gains.

8. Wang knew or was reckless in not knowing that his spoofing scheme was wrongful and illegal. He admitted to federal investigators that he tried "to walk the price up [to]

my advantage" with his non-bona fide buy and sell orders.

9.     Wang also took efforts to conceal his fraudulent actions. For example, Wang described his spoofing scheme in notes maintained on his personal computer. Those notes recite that the "[m]ost important thing is to hide" the manipulative trading:

> ***Most important thing is to hide, so several ways:
> 1. Randomize the pattern as much as possible. (Trade size, position size, hold time)
> 2. Reduce frequency, although this is sacrificing gains.
> 3. Hold longer if possible (when outlook is favorable), could delay 1 day for unloading, or split to 2 days for unloading! Especially when frequency is less. This brings more volatility/risk, but still much less than long-term investing!!  . . .
> 4. Rotate on symbols.
> 5. Bet on fundamentals if I can understand it. . . .
>
> ***If asked why cross-trades with my own account on a different exchange: say might be forgot listing the order on another exchange, or accidentally clicked buy instead of sell (2nd one is better one?).

10.     By engaging in the conduct alleged herein, Wang violated Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)], and Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2) and 78j(b)] and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a) and (c)]. Through this action, the SEC seeks permanent injunctions against Wang, a conduct-based injunction, disgorgement of Wang's ill-gotten gains plus prejudgment interest, and a civil penalty.

## DEFENDANT

11.     Wang, age 51, resides in Fremont, California. Wang obtained an undergraduate degree in physics in China. He also holds a master's degree in computer science from the University of Iowa. Wang has earned an income through day trading. In addition to day trading, Wang founded and controlled a hedge fund known as Greenroots Capital Partners, LP ("Greenroots Capital Partners"). Greenroots Capital Partners was advised by Greenroots Capital Management, LLC ("Greenroots Capital Management"), another entity founded and controlled by Wang. Greenroots Capital Management filed as an exempt reporting adviser in January 2022.

In October 2025, after the Commission's investigation began in this matter, Greenroots Capital Management withdrew as an exempt reporting adviser and represented that Greenroots Capital Partners had been liquidated as of October 28, 2025.

## FACTS

**A.    Wang's Spoofing Scheme**

12.    Wang commenced his spoofing scheme around October 2021 and continued the scheme until at least November 2024. The scheme involved thinly traded ADRs. ADRs are securities representing shares of a foreign company and are traded on U.S. stock exchanges. ADRs allow U.S. investors to invest in foreign companies without having to purchase shares in foreign markets. Each ADR represents an ownership interest in a predetermined number of foreign shares.

13.    Thinly traded securities, including thinly traded ADRs, are securities that have low trading volume. As compared to more actively traded securities with a greater trading volume, thinly traded securities often have fewer interested buyers and sellers and larger spreads between the National Best Bid ("NBB") and National Best Offer ("NBO"). The NBB is the highest reported price a buyer is willing to pay to buy a security. The NBO is the lowest reported price that a seller is willing to accept to sell a security. For thinly traded securities, a small number of orders or trades can impact the NBB and NBO, rendering them more susceptible to manipulation than securities that are more actively traded.

14.    Wang's spoofing scheme followed three basic steps:

a.    Step 1: Wang rapidly placed a series of limit orders for an ADR on one side of the market that he did not intend to execute (the "spoof" orders). A "limit order" is an instruction to buy or sell a security at a specific price or better. This contrasts with a "market order," which is an instruction to buy or sell a security at the best available current price. Wang's limit orders were visible across multiple exchanges because the National Best Bid and Offer ("NBBO") quote aggregates order prices from multiple exchanges to provide the most competitive buy and sell prices. By repeatedly placing limit orders that he had no intention of executing, either well

above the NBB or well below the NBO, Wang created a false impression of market demand or supply for an ADR. The limit orders had the effect of manipulating the NBB or NBO of the targeted ADR.

    b.  <u>Step 2</u>: Wang then executed orders to buy or sell the ADR to take advantage of the manipulated price. Wang executed these orders through a different brokerage to conceal his actions. Many of the executed trades were made in an account that belonged to Wang's wife. Wang had trading authority over that account.

    c.  <u>Step 3</u>: Wang then canceled the pending, non-bona fide limit orders he placed in Step 1, typically before those orders could be executed.

15. An example shows how the scheme worked. On January 23, 2023, at 10:16 a.m., Wang offered <u>to sell</u> the ADRs of Mabuchi Motor Co., Ltd. (OTCPK: MBUMY), a Japanese company whose ADRs trade on U.S. over-the-counter (OTC) markets, by placing a sell limit order of $7.33, below the NBO of $7.38. Four seconds later, Wang canceled the order after the NBO had moved from $7.38 to $7.33. Then, from 10:16 to 10:17 a.m., Wang submitted and promptly canceled seven additional orders, continuously lowering the offered limit price, which had the effect of further lowering the NBO to $7.04 and the midpoint price of the NBO and NBB to $6.86. At 10:17 a.m., Wang placed a final non-bona fide sell order, which he left open.

16. Minutes later, from 10:29 a.m. to 10:53 a.m., Wang <u>purchased</u> 4,400 shares of MBUMY through a different brokerage <u>in an account in the name of his wife</u> at the artificially low midpoint price of $6.865-$6.87/share. Then, at 10:57 a.m., Wang canceled his one remaining outstanding spoof sell order.

17. Wang's order and trade data for MBUMY on January 23, 2023 is summarized in the below table:

| Time (EST) | Non-bona fide order activity | NBO | Buy/Sell Activity |
|---|---|---|---|
| 10:16:48 a.m. | Wang submits an order to sell 100 shares (limit price $7.33). | $7.38 | |
| 10:16:52 | Wang cancels the 10:16:48 a.m. sell order. | $7.33 | |
| 10:16:52 – 10:16:55 | Wang submits an order to sell 100 shares (limit price $7.28) and cancels it three seconds later. | $7.28 | |

| Time (EST) | Non-bona fide order activity | NBO | Buy/Sell Activity |
|---|---|---|---|
| 10:16:55-10:16:58 | Wang submits an order to sell 100 shares (limit price $7.23) and cancels it three seconds later. | $7.23 | |
| 10:16:58 – 10:17:01 | Wang submits an order to sell 100 shares (limit price $7.18) and cancels the order three seconds later. | $7.18 | |
| 10:17:01 – 10:17:05 | Wang submits an order to sell 100 shares (limit price of $7.13) and cancels the order four seconds later. | $7.13 | |
| 10:17:05 – 10:17:08 | Wang submits an order to sell 100 shares (limit price $7.08) and cancels the order three seconds later. | $7.08 | |
| 10:17:08 – 10:17:12 | Wang submits an order to sell 100 shares (limit price $7.03) and cancels the order four seconds later. | $7.03 | |
| 10:17:12 – 10: 17:15 | Wang submits an order to sell 100 shares (limit price $7.08) and cancels the order three seconds later. | $7.04 | |
| 10:17:15 | Wang submits an order to sell 100 shares (limit price $7.05). | $7.04 | |
| 10:29:09-10:53:04 | | $7.05 | Wang purchases 4,400 shares at $6.865-$6.87 per share (using buy orders with a $7.05 limit price). |
| 10:57:26 | Wang cancels the 10:17:15 sell order. | | |

18.     The next day, January 24, 2023, Wang performed the scheme in reverse. At 9:37 a.m., Wang began placing—and promptly canceling—multiple visible buy limit orders for MBUMY well above the NBB, continuously raising the limit price. Wang's orders had the effect of raising the NBB for MBUMY from $6.65 to a high of $7.00 and the midpoint price of the NBO and NBB from $7.075 to a high of $7.205.

19.     Minutes after placing the first spoof buy order, Wang commenced selling the MBUMY shares from a different account, which he acquired the day before at manipulated low prices, selling all 4,400 shares at the midpoint price by 11:12 a.m. At 11:21 a.m., Wang canceled the remaining outstanding buy order.

20.     Wang's order and trade data for MBUMY on January 24, 2023 is summarized in

the below table:

| Time (EST) | Non-bona fide order activity | NBB | Buy/Sell Activity |
|---|---|---|---|
| 9:37:48 a.m. | Wang submits an order to buy 100 shares (limit price $6.71). | $6.65 | |
| 9:37:52 | Wang cancels the 9:37:48 buy order. | $6.71 | |
| 9:37:52 – 9:37:56 | Wang submits an order to buy 100 shares with a limit price of $6.77 and cancels the order four seconds later. | $6.77 | |
| 9:37:56 – 9:38:00 | Wang submits an order to buy 100 shares with a limit price of $6.83 and cancels the order four seconds later. | $6.83 | |
| 9:38:00 – 9:38:06 | Wang submits an order to buy 100 shares with a limit price of $6.82 and cancels the order six seconds later. | $6.82 | |
| 9:38:06 – 9:38:10 | Wang submits an order to buy 100 shares with a limit price of $6.88 and cancels the order four seconds later. | $6.88 | |
| 9:38:10 – 9:38:16 | Wang submits an order to buy 100 shares with a limit price of $6.94 and cancels the order six seconds later. | $6.94 | |
| 9:38:16 – 9:38:20 | Wang submits an order to buy 100 shares with a limit price of $7.00 and cancels the order four seconds later. | $7.00 | |
| 9:38:20 – 9:38:25 | Wang submits an order to buy 100 shares with a limit price of $6.98 and cancels the order five seconds later. | $6.98 | |
| 9:38:25 | Wang submits an order to buy 100 shares with a limit price of $6.97. | $6.98 | |
| 9:42:04 – 9:42:12 | | $6.97 | Wang sells 600 shares at $7.205/share (from sell orders with a $6.97 limit price). |
| 9:57:39 | Wang cancels the 9:38:25 buy order. | $6.97 | |
| 9:57:39 – 10:01:48 | Wang submits an order to buy 100 shares (limit price $6.95) and cancels the order four minutes later. | $6.95 | |
| 10:02:20 – 10:02:24 | Wang submits an order to buy 100 shares (limit price $6.99) and cancels the order four seconds later. | $6.99 | |
| 10:02:24 | Wang submits an order to buy 100 shares (limit price $6.94). | $6.99 | |

| Time (EST) | Non-bona fide order activity | NBB | Buy/Sell Activity |
|---|---|---|---|
| 10:05:01 – 10:16:49 | | $6.94 | Wang sells 2,200 shares at $7.15/share (from sell orders with a $6.94 limit price). |
| 10:22:47 | Wang cancels the 10:02:24 buy order. | $6.94 | |
| 10:22:47 – 10:27:56 | Wang submits an order to buy 100 shares (limit price $6.96) and cancels the order five minutes later. | $6.96 | |
| 10:27:56 – 10:28:00 | Wang submits an order to buy 100 shares (limit price $6.95) and cancels the order four seconds later. | $6.95 | |
| 10:28:00 | Wang submits an order to buy 100 shares (limit price $6.93). | $6.95 | |
| 10:29:54 – 10:43:39 | | $6.94 | Wang sells 1,300 shares at $7.15/share (from sell limit orders with a $6.94 limit price). |
| 11:00:43 | Wang cancels the 10:28:00 buy order. | $6.94 | |
| 11:00:43 - 11:00:48 | Wang submits an order to buy 100 shares (limit price $6.96) and cancels the order five seconds later. | $6.96 | |
| 11:00:48 | Wang submits an order to buy 100 shares (limit price $6.93). | $6.96 | |
| 11:12:51 | | $6.94 | Wang sells 300 shares at $7.15/share (from a sell limit order with a $6.94 limit price). |
| 11:21:53 | Wang cancels the 11:00:48 buy order. | $6.94 | |

21. Wang's activity constituted 100% of the trading volume in MBUMY on both January 23 and January 24, 2023. Through his manipulation of the price of MBUMY securities on January 23 and 24, Wang obtained an approximate illegal profit of $1,270.

22. Wang repeated this same scheme for different ADR securities. All told, Wang placed thousands of market-moving "spoof" orders that he later canceled. Through this scheme,

COMPLAINT

8

*SEC v. WANG*

Wang purchased ADRs at artificially deflated prices and sold ADRs at artificially inflated prices.

23. Wang has acknowledged that he placed non-bona fide orders for ADRs to manipulate their market prices. On or about July 24, 2025, U.S. Postal Inspectors conducted a search of Wang's residence. In connection with that search, Wang told inspectors that he tried "to walk the price up [to] my advantage" and thereby increase his trading profits.

24. Documents stored on Wang's personal computer further confirm that Wang intended to manipulate the market for ADR securities through spoofing. One document generated in or around October 2021, describing Wang's "action plan" for ADR trading, states that Wang would "[c]heck symbols in my symbol-to-try list" and then "push down ask-price, and wait for a few minutes to buy …." Another Wang-created document, also generated around October 2021, recites that an important factor in selecting an ADR to trade is "how much I can push the bid up!!"

25. In a different document, Wang mused that he should "[s]pend more time to understand the fundamentals" of the ADRs because "[i]f [I] can combine fundamental news with this, it is extra powerful!! And looks more real too!!"

26. In total, Wang reaped approximately $1.3 million in ill-gotten gains through his manipulation of ADR securities.

**B.** **Wang Knew or Was Reckless in Not Knowing That His Conduct Was Manipulative and Wrongful**

27. Wang knew or was reckless in not knowing, based on a warning from his broker, that using different accounts to act on both the buy side and sell side of a securities transaction raised legal issues. In particular, in 2016, Wang's brokerage flagged that Wang had engaged in potential wash trading in his account and in an account held by Wang's brother, which Wang controlled, when Wang executed buy orders for options in his own account and near-simultaneous sell orders for the same options in his brother's account. A representative from the brokerage's compliance department informed Wang that when "accounts with a single beneficial owner, or accounts under common control, or otherwise related accounts, are on both

the buy side and the sell side of a transaction. . . [t]his activity may – depending on the intent of the trader(s) – be a violation of exchange rules or of the Securities Exchange Act of 1934. . . ."

28.    Wang took steps to conceal his conduct. For example, as discussed above, Wang attempted to hide his scheme by trading in different accounts at different brokerages. He placed the non-bona fide spoof orders through one brokerage and placed the bona fide trades through a different brokerage, often in an account held in his wife's name.

29.    Wang also generated documents describing his ADR trading strategy in which he emphasized the importance of concealing his market-manipulative actions. One such document recites that the "[m]ost important thing is to hide" and reads, in pertinent part:

> ***Most important thing is to hide, so several ways:
> 1. Randomize the pattern as much as possible. (Trade size, position size, hold time)
> 2. Reduce frequency, although this is sacrificing gains.
> 3. Hold longer if possible (when outlook is favorable), could delay 1 day for unloading, or split to 2 days for unloading! Especially when frequency is less. This brings more volatility/risk, but still much less than long-term investing!!  . . .
> 4. Rotate on symbols.
> 5. Bet on fundamentals if I can understand it. . . .
>
> ***If asked why cross-trades with my own account on a different exchange: say might be forgot listing the order on another exchange, or accidentally clicked buy instead of sell (2nd one is better one?).

30.    A different document stored on Wang's personal computer, dated July 9, 2022, reiterates that "it is important to hide my actions, and that requires having some losses!!" The same document sets forth Wang's plan to "press down ask price" before buying and "boost [the] bid[] price" before selling.

31.    Other materials generated by Wang also establish that Wang knew or was reckless in not knowing that his actions were wrongful. Undated notes on Wang's computer, which appear to have been created in late 2024 or 2025, demonstrate a concern that one brokerage was scrutinizing Wang's trading as part of an anti-money laundering ("AML")

review. Wang's notes reference a Wikipedia page concerning spoofing and law enforcement actions against individuals for spoofing. Wang nonetheless appears to reassure himself that, even were his spoofing scheme discovered, the likely "[w]orst case is [a] penalty [of] money":

> So far, [the brokerage] questions clear point to AML ONLY, no questions on trading . . . [the other brokerage] is blocking outflow, but they got no clue since didn't make money there! . . . Most likely is warnings first? . . . Worst case is penalty on money? (Give up 2024 gains + some penalty?) Most likely civil charges!!

32. Wang's notes also describe how he could attempt to justify his wrongful actions if questioned about them. According to the notes, Wang could claim that he was merely trading "based on news" or the "discount to last close price," and that Wang "[d]oesn't know layering or spoofing or those things!!"

33. Wang apparently stopped his spoof trading in or around November 2024. Nonetheless, Wang's notes detail "[p]ossible strategies in 2026 or 2027 if needed." Regarding these "new strategies" for ADR trading, a January 2025 note states: "Hiding my action is the main focus[:] … doing it less often and bigger amount, hide it with volatile movement in US index, forex or other Macro events, or stock individual events."

34. Finally, in July 2025, Postal Inspectors conducted a search of Wang's residence. They discovered two books: A CONVICTED STOCK MANIPULATORS [sic] GUIDE TO INVESTING and HOW STOCKS ARE MANIPULATED.

## CLAIMS FOR RELIEF

## COUNT I

**Fraud in Violation of Section 17(a)(1) and (3) of the Securities Act**

35. The Commission realleges and incorporates by reference the above paragraphs 1 to 34 as if they were fully set forth herein.

36. As set forth above, Wang engaged in a scheme to fraudulently manipulate the prices of thinly traded ADRs by placing non-bona fide spoof orders that he had no intention of executing. Wang then profited from his scheme by executing orders at the resulting manipulated prices. Wang knew, or was reckless or negligent in not knowing, that this type of trading was

improper, manipulative, and illegal. Wang acted with scienter and took steps to conceal his wrongful conduct.

37.     By virtue of the foregoing, Wang, directly or indirectly, in the offer or sale of securities, and by the use of the means or instruments of transportation or communication in interstate commerce or the mails:

   a.   Knowingly or recklessly employed one or more devices, schemes or artifices to defraud; and

   b.   Knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

38.     By virtue of the foregoing, Wang violated, and, unless restrained and enjoined, will again violate, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## COUNT II

### Fraud in Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5(a) and (c) thereunder

39.     The Commission realleges and incorporates by reference the above paragraphs 1 to 34 as if they were fully set forth herein.

40.     As set forth above, Wang engaged in a scheme to fraudulently manipulate the prices of thinly traded ADRs by placing non-bona fide spoof orders that he had no intention of executing. Wang then profited from his scheme by executing orders at the resulting manipulated prices. Wang knew, or was reckless in not knowing, that this type of trading was improper, manipulative, and illegal. Wang acted with scienter and took steps to conceal his wrongful conduct.

41.     By virtue of the foregoing, Wang directly or indirectly, in connection with the purchase or sale of a security, by use of the means or instruments of interstate commerce, or of the mails, or of the facilities of a national securities exchange, knowingly or recklessly:

   a.   Employed one or more devices, schemes, or artifices to defraud; and

b. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

42. By virtue of the foregoing, Wang violated and, unless restrained and enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)].

## COUNT III

### Violation of Section 9(a)(2) of the Exchange Act

43. The Commission realleges and incorporates by reference the above paragraphs 1 to 34 as if they were fully set forth herein.

44. As set forth above, Wang engaged in a scheme to fraudulently manipulate the prices of thinly traded ADRs by placing non-bona fide spoof orders that he had no intention of executing. Wang then profited from his scheme by executing orders at the resulting manipulated prices. Wang knew, or was reckless in not knowing, that this type of trading was improper, manipulative, and illegal. Wang acted with scienter and took steps to conceal his wrongful conduct.

45. By virtue of the foregoing, Wang, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, effected, alone or with one or more other persons, a series of transactions in a security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the purchase or sale of such security by others.

46. By virtue of the foregoing, Wang violated and, unless restrained and enjoined, will again violate, Section 9(a)(2) of the Exchange Act [15 U.S.C. § 78i(a)(2)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

A. Determine that Wang violated the federal securities laws and regulations alleged against him in this Complaint;

B. Issue a judgment, in a form consistent with Rule 65(d) of the Federal Rules of

Civil Procedure, permanently enjoining Wang and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)]; Sections 9(a)(2) and 10(b) of the Exchange Act [15 U.S.C. §§ 78i(a)(2) and § 78j(b)] and Exchange Act Rule 10b-5(a) and (c) [17 C.F.R. § 240.10b-5(a) and (c)];

C.    Issue a judgment in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure enjoining Wang and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from, directly or indirectly, opening, maintaining or trading in any brokerage account(s) in Wang's name, the names of any immediate family members, the names of any companies over which he has any control, or the name(s) of any third party individuals, without providing the relevant broker-dealer(s) a copy of the Complaint and judgment or any final judgment entered against him in this action, pursuant to Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)];

D.    Ordering Wang to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received, directly or indirectly, as a result of the conduct alleged in the Complaint pursuant to Section 21(d)(3), (5), and (7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (5), and (7)];

E.    Ordering Wang to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

F.    Granting such other and further relief as the Court may deem just and appropriate.

## **JURY DEMAND**

The Commission demands a trial by jury.


Dated:  June 24, 2026                              By:    */s/ Eugene N. Hansen*
                                                          Eugene N. Hansen
                                                          SECURUTIES AND EXCHANGE
                                                          COMMISSION
                                                          100 F Street NE
                                                          Washington, D.C. 20549
                                                          (202) 551-6091
                                                          hansene@sec.gov

                                                          Of Counsel:
                                                          Timothy England
                                                          Christina McGill
                                                          Kevin Wu
                                                          SECURITIES AND EXCHANGE
                                                          COMMISION
                                                          100 F Street NE
                                                          Washington, D.C. 20549

                                                          *Attorneys for Plaintiff*
                                                          *Securities and Exchange Commission*